**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

GBB DRINK LAB, INC.,

      Plaintiff,

      v.

FSD PHARMA INC. and FSD
BIOSCIENCES INC.,

      Defendants.

**CASE NO: 23-CV-60800-AHS**

## DEFENDANTS FSD PHARMA INC. AND FSD BIOSCIENCES INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT, AND DEFENDANT FSD PHARMA'S COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Defendants FSD Pharma Inc. ("FSD Pharma") and FSD Biosciences Inc. ("FSD Biosciences") (collectively, "FSD" or "Defendants") file this Answer to Plaintiff GBB Drink Lab, Inc.'s ("Plaintiff" or "GBB") Amended Complaint.

### Answer to "Preliminary Statement"

Plaintiff's claims in this statement are legal conclusions and allegations for which they will bear the burden of proof at trial. Because they require no further response, they are denied.

### Answers to "Parties"

1.      Admitted in part; denied in part. It is admitted upon information and belief that GBB is an active Florida for-profit corporation, with a principal address in Weston, Florida. Defendants are without sufficient knowledge to confirm the efficacy or novelty of the Plaintiff's alleged "world's first rapid blood alcohol detoxification product" and these allegations are therefore denied. By way of further response, in August 2023, Safety Shot Inc. f/k/a Jupiter Wellness Inc. acquired GBB's operating assets.

2.      Admitted in part; denied in part. It is denied that Zeeshan Saeed is the President of FSD Pharma. The remaining allegations are admitted.

3.      Admitted in part; denied in part. It is admitted that FSD Biosciences, Inc. is a Delaware company and wholly-owned subsidiary of FSD Pharma. The remaining allegations are denied.

<u>**Answers to "Jurisdiction and Venue"**</u>

4.      Admitted in part; denied in part. It is admitted that FSD Biosciences is a Delaware-based corporate entity wholly owned by FSD Pharma. It is further admitted that Zeeshan Saeed and Anthony Durkacz are residents of Ontario, as the precise addresses of nonparties to this suit are irrelevant. Defendants are without sufficient knowledge to independently verify the current citizenship of each of Plaintiff's officers and directors, and as such those statements are denied. The remaining allegations in this paragraph are legal conclusions to which no response is required, and they are therefore denied.

5.      Denied. The allegations advanced in this paragraph are legal conclusions to which no response is required, and they are therefore denied.

6.      Admitted in part; denied in part. It is admitted only that the Mutual NDA is an agreement which exists and is a material element of this dispute. The Mutual NDA is a document that speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied.

7.      Denied. The allegations advanced in this paragraph are legal conclusions to which no response is required, and they are therefore denied.

<u>**Answers to "General Allegations"**</u>

8.      Denied. Defendants are without sufficient knowledge and information to verify

2

Plaintiff's investment of time and money into their product. Defendants are also currently unaware of any scientific or peer-reviewed source that claims, shows, or proves that alcohol converts to sugar when metabolized in the body. The allegations raised in this paragraph are therefore denied.

9.      Denied. Defendants are without sufficient knowledge and information to verify GBB's beliefs, and these allegations are therefore denied. To the extent that Plaintiff references the Mutual NDA in this paragraph, the Mutual NDA is a document that speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied.

10.     Denied. Defendants are without sufficient knowledge and information to verify the occurrence of alleged meeting referenced in this Paragraph or the substance of the alleged conversation, and these allegations are therefore denied. Further, it is denied that Romano was a consultant or "in contention to become the CEO of FSD Pharma."

11.     Admitted in part; denied in part. It is admitted only that on or about June 14, 2022, such a meeting occurred in the Cayman Islands, attended by Messrs. Durkacz, Fernando Cugliari, Joseph Romano and John Gulyas, during which Plaintiff's drink was discussed and sampled. Defendants deny the Plaintiff's characterizations of the conversation and the order in which the drink was tested by the attendees. Further, Defendants are without sufficient knowledge or information to verify that the Plaintiff's drink "worked" during the meeting or whether there was a discussion of signing a mutual non-disclosure agreement, and these allegations are therefore denied.

12.     Denied. Defendants lack sufficient knowledge as to what Plaintiff means by "actively looking at" a drink with the capacity of reducing blood alcohol levels, and Plaintiff's allegation of the same is therefore denied.

13.     Admitted in part; denied in part. It is admitted only that Defendants expressed an

interest in potentially acquiring Plaintiff's company and assets. It is denied that Defendants had verified or understood that Plaintiff's "assets […] worked as intended." Defendants are without knowledge or information to verify the efficacy of Plaintiff's product, and the Plaintiff's allegations of the same are therefore denied.

14.     Admitted in part; denied in part. It is admitted that on July 5, 2022, the parties entered into the Mutual NDA. The Mutual NDA is a document that speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied.

15.     Denied. The Mutual NDA is a document that speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied.

16.     Denied. The Mutual NDA is a document that speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied.

17.     Denied. The Mutual NDA is a document that speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied. By way of further response, Defendants are without sufficient knowledge of the alternative steps Plaintiff may or may not have taken, and of what the Plaintiff "believed" at the time, and as such the Plaintiff's allegations of the same are therefore denied. To the extent it is implied that GBB would not have shared its alleged "Confidential Information" without an NDA, that allegation is expressly denied. GBB shared its drink with FSD on or about June 14, 2022, without any NDA in place.

18.     Denied. The Mutual NDA is a document that speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied.

19.     Denied. The Mutual NDA is a document that speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied.

20.     Denied. The Mutual NDA is a document that speaks for itself, and Plaintiff's

characterization of the content of that document is therefore denied.

21.     Admitted in part; denied in part. It is admitted the Dr. Kotra requested information as part of due diligence, that data rooms were created to conduct the exchange of information, and that Plaintiff provided Defendants with certain information. Defendants are without sufficient information to verify Plaintiff's allegations regarding what Plaintiff relied on at the time, and these allegations are therefore denied. To the extent that Plaintiff references an email from Dr. Kotra on or around August 5, 2022, that is a document which speaks for itself and Plaintiff's characterizations of the same are therefore denied.

22.     Denied. Defendants cannot verify the thoughts and feelings of the Plaintiff at this time, and the allegations are therefore denied. To the extent that the Plaintiff's allegations discuss emails, they are documents which speak for themselves and Plaintiff's characterization of the same is therefore denied.

23.     Admitted in part; denied in part. It is admitted that Plaintiff's patents were transmitted to the Defendants at some point in time. Defendants are without sufficient information or knowledge to verify the remaining allegations in this paragraph, and they are therefore denied. To the extent that the Plaintiff's allegations discuss emails, they are documents which speak for themselves and Plaintiff's characterization of the same is therefore denied.

24.     Admitted in part; denied in part. It is admitted only that a meeting took place in Dallas, Texas. The remaining allegations of this paragraph are primarily legal conclusions of the existence of trade secrets to which no response is required, and they are therefore denied. To the extent that Plaintiff claims its ingredient list "was not disclosed in any way to the public through the filing of patents or otherwise," it is denied. It is further denied that any "methods and techniques of combining the ingredients and manufacturing the drink" were shared during the meeting.

Further, to the extent that Plaintiff alleges that such methods can be considered a trade secret, those are legal conclusions to which no response is required and the same are therefore denied.

25.     Denied. The substance of this paragraph constitutes legal conclusions to which no response is required, and they are therefore denied. To the extent that Plaintiff claims that its formula of ingredients actually lowers an individual's BAC, Defendants are without sufficient knowledge and information to verify the same and it is therefore denied. To the extent that Plaintiff claims that the "Defendants would never have known" about the ingredients or their alleged uses, the same is denied as conjecture which cannot be verified. To the extent that Plaintiff claims that information about the ingredients "was not generally known nor was it made generally available in the public domain[,]" the Plaintiff has not made its "revised ingredient list" known to the Defendants to verify the same, and these allegations are therefore denied.

26.     Admitted in part; denied in part. Defendants admit that the samples were requested from Plaintiff. Defendants are without sufficient information and knowledge to verify the Plaintiff's considerations and thoughts at the time stated herein before sending the samples, and the same is therefore denied. Defendants disagree with the characterization of the product as "highly proprietary" and re-assert their denial of Plaintiff's claims that the formula "was not disclosed in any way to the public through the filing of patents or otherwise, and these allegations are therefore denied.

27.     Admitted in part; denied in part. It is admitted that the parties exchanged drafts of the "Asset Purchase Agreement" and "Work Product Assignment Agreement". Defendants are without sufficient information and knowledge to verify that these drafts were sent on October 26, 2022 in a single email. To the extent Plaintiff characterizes the Asset Purchase Agreement, Work Product Assignment Agreement, or email transmitting the same, these are documents which will

6

speak for themselves and Plaintiff's characterizations are therefore denied.

28.     Admitted in part; denied in part. It is admitted that the Defendants' representatives met with the Plaintiff's representatives in Texas at around this time at the manufacturing plant. It is denied that the travel to Texas was for the "sole purpose" of permitting Plaintiff to "demonstrate the precise methods, exact ingredients, techniques, formulas, and equipment used to manufacture GBB's proprietary drink, none of which information is contained within GBB's filed patents." It is further denied that any such information was actually shared to the Defendants during the meeting. To the extent that Plaintiff suggests any trade secrets were revealed to Defendants during this visit, that allegation is a legal conclusion to which no further response is required, and these allegations are therefore denied.

29.     Admitted in part; denied in part. It is admitted only that on November 15, 2022, Defendants became aware of GBB's new counsel. To the extent Plaintiff suggests this counsel attempted to negotiate the same terms previously agreed upon by the parties, these allegations are denied.

30.     Denied. To the extent Plaintiff suggests GBB's new counsel attempted to negotiate the same terms previously agreed upon by the parties, these allegations are denied. To the extent that Plaintiff references a formal termination letter submitted on December 12, 2022, it is a document which speaks for itself and Plaintiff's characterizations of the same are therefore denied.

31.     Admitted in part; denied in part. Defendants are unaware of any "technology" and "know-how" that was not already within the public domain for beverage manufacturing, and therefore those allegations are denied. It is admitted that the Defendants worked with the Plaintiff for a span of months on what they believed at the time could have been a mutually beneficial business opportunity, and that Defendants announced the launch of their own research and

development program in 2023.

32.     Denied. The February 14, 2023 Press Release is a document that speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied.

33.     Denied. The Feb. 14, 2023 Press Release is a document that speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied. To the extent that Plaintiff discusses its own expectations at the time, Defendants are without knowledge to verify this and the same is therefore denied. Plaintiff's remaining allegations in this paragraph are legal conclusions to which no further response is required, and are therefore denied.

34.     Denied. The email sent by the Plaintiff to the Defendants on February 23, 2023 is a document that speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied.

35.     Admitted in part; denied in part. It is admitted that the quote from Kevin Harrington is accurate. The February 28, 2023 Press Release is a document that speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied.

36.     Admitted in part; denied in part. It is admitted that the screenshot comes from the Instagram account owned by Kevin Harrington. Mr. Harrington's post is a document which speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied. Defendants are without sufficient information to verify Plaintiff's allegations of what Mr. Harrington knew or thought at this time, and the same is therefore denied. Further, Plaintiff's allegations are legal conclusions to which no response is required, and they are therefore denied.

37.     Admitted in part; denied in part. It is admitted only that the quotes from the Feb. 28, 2023 Press Release are accurate. Defendants are without sufficient information to verify the Plaintiff's concerns regarding the February 28, 2023 Press Release, and the same is therefore

denied. Further, Plaintiff couches these legal conclusions as "concerns" which require no response, and they are therefore denied. The February 28, 2023 Press Release is a document that speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied.

38.    Admitted in part; denied in part. It is admitted that Defendants made these announcements. However, it is denied that Defendants did anything to "exploit the public." The remaining allegations appear to be legal conclusions to which no response is required, and they are therefore denied.

39.    Admitted in part; denied in part. It is admitted that Defendants participated in a call. Defendants are without sufficient knowledge and information to verify Plaintiff's characterization of that conversation, and it is therefore denied. The remainder of this paragraph contains legal conclusions to which no response is required, and they are therefore denied.

40.    Admitted in part; denied in part. It is admitted that Gerry David joined the Defendants' advisory board, and that Defendants published the March 30, 2023 Press Release regarding the same with the quoted language. The March 30, 2023 Press Release is a document which speaks for itself, and Plaintiff's characterization of the content of that document is therefore denied. Plaintiff's "concerns" regarding additions to the Defendants' advisory board are irrelevant to this action, and the Defendants are without knowledge and information to verify the same and they are therefore denied.

41.    Denied. The allegations of this paragraph are legal conclusions to which no response is required, and they are therefore denied.

42.    Denied in part; admitted in part. These allegations are legal conclusions to which no response is required, and they are therefore denied. Defendants admit only that the letter was sent, received, and that Defendants continued with their development.

43.     Denied in part; admitted in part. It is admitted only that the September 28, 2022 email from Mr. Durkacz was sent. However, this email is a document which shall speak for itself, and Plaintiff's characterizations of the same are therefore denied. The remaining allegations of this paragraph are legal conclusions to which no response is required, and they are therefore denied.

44.     Denied. It is expressly denied that Mr. Durkacz "advised" anyone that "a drink Defendants had been working on creating in a parallel program was almost identical to what GBB had been developing and shared with Defendants under the terms of the Mutual NDA." To the contrary, any beverage formulation developed by FSD was done so wholly independently from GBB.

45.     Admitted in part; denied in part. Defendants admit only that they independently developed their own beverage. Defendants are without sufficient knowledge and information to respond to the remaining allegations, and they are therefore denied.

46.     Denied. Plaintiff characterizes the nature of the conversation alleged, and Defendants are without sufficient information and knowledge to verify the same. It is therefore denied, and strict proof is required to justify these allegations.

47.     Denied. Defendants are without sufficient knowledge and information to verify Plaintiff's allegations, including whether anything in Plaintiff's formulation was publicly available and whether it could "only have come from GBB." These allegations are therefore denied.

48.     Admitted in part; denied in part. It is admitted that Defendants engaged with Power Brands, and that they contacted suppliers regarding potential ingredients. The remainder of Plaintiff's allegations, including all legal conclusions to which no response is required, are denied.

**<u>Answers to "Count I – Breach of Contract Under the Mutual NDA (Against Defendants)"</u>**

49.     Defendants reincorporate and reiterate their responses to the allegations as set forth

in the foregoing paragraphs.

50.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

51.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

52.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

53.     This paragraph constitutes a request to the Court, to which the Defendants respectfully request a summary denial.

54.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

55.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

56.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

57.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

58.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

### Answers to "Count II – Misappropriation of Trade Secrets Under 18 U.S. Code § 1836 (Against Defendants)"

59.     Defendants reincorporate and reiterate their responses to the allegations as set forth in the foregoing paragraphs.

60.     Denied. The allegations of this paragraph are legal conclusions to which no

162435.00604/134298436v.1

response is required, and the same are therefore denied.

61.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

62.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

63.     Denied in part; admitted in part. It is admitted only that FSD Biosciences, Inc. is organized under Delaware law. The remaining allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

64.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied. To the extent that Plaintiff alleges what it instructed its officer and directors to do, Defendants are without sufficient knowledge and information to verify the same, and it is therefore denied.

65.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied. To the extent that the allegations refer to the Mutual NDA, the document speaks for itself.

66.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

67.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

68.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

69.     Denied. The allegations of this paragraph contain legal conclusions to which no response is required, and the same are therefore denied. To the extent that Plaintiff alleges

"[m]ultiple potential serious investors" that allegedly "pulled out of contemplated multi-million dollar deals[,]" Defendants are without knowledge of any such investors or deals, and the same is therefore denied.

## Answers to "Count III – Misappropriation of Trade Secrets Under Florida Uniform Trade Secrets Act (Against Defendants)"

70.     Defendants reincorporate and reiterate their responses to the allegations as set forth in the foregoing paragraphs.

71.     Denied. Defendants are without sufficient knowledge and information to verify Plaintiff's policies and procedures, and allegations of the same are therefore denied. Further, the Mutual NDA is a document which speaks for itself, and Plaintiff's characterizations of it are therefore denied. The remaining allegations advanced in this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

72.     Denied. Defendants are without sufficient knowledge and information to verify Plaintiff's allegations, and the same are therefore denied. The remaining allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

73.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

74.      Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

75.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

76.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

77.     Denied. The allegations of this paragraph are legal conclusions to which no response is required, and the same are therefore denied.

**WHEREFORE,** Defendants respectfully request that this Court:

a)  dismiss the Complaint in its entirety, with prejudice;

b)  award Defendants their costs in this action;

c)  award Defendants reasonable attorneys' fees as permitted by law; and

d)  grant to Defendants such other and further relief as the Court deems appropriate.

## AFFIRMATIVE DEFENSES

Further, in response to the allegations of the Plaintiff, and reserving the right to supplement this Answer with additional defenses based upon new information learned in the course of discovery, Defendants raise the following affirmative defenses:

### First Affirmative Defense

Plaintiff has failed to state a claim upon which relief can be granted.

### Second Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by Plaintiff's own unclean hands.

### Third Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because Plaintiff acted in bad faith.

### Fourth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate its damages.

### Fifth Affirmative Defense

Plaintiff's claims may be barred, in whole or in part, by Plaintiff's failure to join all necessary and indispensable parties to this action.

14

### Sixth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because Defendants only used publicly available information about the ingredients on GBB's ingredient list.

### Seventh Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because Defendants independently developed their own formulation.

### Eighth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because it has not sustained any injury or damage.

### Ninth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, due to Plaintiff's failure to maintain its alleged trade secrets in secret.

### Tenth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because its alleged trade secrets do not derive independent economic value.

162435.00604/134298436v.1

## DEFENDANT FSD PHARMA'S COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Counterclaim Plaintiff/Third-Party Plaintiff FSD Pharma Inc. ("FSD Pharma" or "FSD") brings this Counterclaim and Third-Party Claim against Counterclaim Defendant, GBB Drink Lab, Inc. ("GBB"), and Third-Party Defendant, Joseph Romano ("Romano"), and alleges as follows:

### PARTIES

1.      Counterclaim Plaintiff/Third-Party Plaintiff FSD Pharma is a corporation headquartered in Ontario, Canada.

2.      Counterclaim Defendant, GBB, is a Florida corporation with its principal place of business in Florida. GBB sold its operating assets to Safety Shot, Inc. f/k/a Jupiter Wellness, Inc., a Florida corporation.

3.      Third-Party Defendant, Joseph Romano ("Romano"), is, upon information and belief, an individual who resides at 61 Conch Drive, George Town, Grand Cayman, Cayman Islands. He is an attorney and former member of FSD's Board of Directors.

### JURISDICTION AND VENUE

4.      This Court has supplemental jurisdiction over the counterclaim/third-party claim pursuant to 28 U.S.C. § 1367 because GBB submitted to the original jurisdiction and diversity jurisdiction of this Court, and the claims being raised within FSD's counterclaim/third-party claim form part of the same case and/or controversy.

5.      The Court also has personal jurisdiction over Romano, because, upon information and belief, Romano established minimum contacts within this District such that the exercise of jurisdiction over Romano would not offend traditional notions of fair play and substantial justice. Specifically, upon information and belief, Romano's extensive collaboration with GBB, as described below and which forms the foundation of this Third-Party Complaint, occurred in this

16

District.

6.      Both GBB and FSD have submitted to venue laying in the United States Court of the Southern District of Florida and thus venue is proper.

7.      Venue for claims asserted against Romano is also proper in this District because Romano's alleged statements improperly made to GBB, were made to GBB in this District, as detailed below, and were made with the knowledge that they would be utilized in GBB's Amended Complaint, in this Court, within this District.

## GENERAL ALLEGATIONS

8.      FSD is a biopharmaceutical company dedicated to building a portfolio of innovative assets and biotech solutions for the treatment of challenging neurodegenerative, inflammatory and metabolic disorders and alcohol misuse disorders with drug candidates in different stages of development.

9.      FSD was first introduced to GBB by Joseph Romano, an attorney who worked closely with FSD and its executive team for several years prior to FSD's acquisition of Lucid Psycheceuticals, a company FSD acquired in September 2021.

10.     Upon information and belief, though his law practice is based in Toronto, where FSD is headquartered, Romano lives in the Cayman Islands.

11.     In June 2022, Romano invited several FSD executives, including Anthony Durkacz, FSD's Founder and Executive Co-Chairman ("Durkacz"), and his longtime friend Fernando Cugliari, then an FSD board member who also lived in the Cayman Islands ("Cugliari"), to meet in the Cayman Islands to discuss business matters wholly unrelated to GBB, which at that time was not known to Durkacz.

12.     Durkacz met with Romano and Cugliari in the Cayman Islands on June 14, 2022.

While there, Romano introduced Durkacz and Cugliari to John Miklos Gulyas, a GBB Executive ("Gulyas"), and Jonathan Thau, a GBB consultant ("Thau").

13.    By this time, Romano had already established a longstanding relationship with Thau, spanning several years.

14.    Unbeknownst to Durkacz, Romano also invited Gulyas and Thau to fly to the Cayman Islands so they could pitch GBB's product and business to FSD.

15.    While at dinner that evening, Gulyas boasted about GBB and its efforts to develop a beverage that he claimed enhanced something in the body to shorten the duration of the impairment effects caused by alcohol.

16.    Eager to impress Durkacz and Cugliari, Gulyas conveniently brought with him to the dinner two samples of GBB's beverage and enthusiastically encouraged Durkacz and Cugliari to try it, in hopes of wooing FSD to invest in or acquire GBB.

17.    At no time during that initial meeting were Durkacz or Cugliari required to sign any form of confidentiality or non-disclosure agreement, as GBB and Gulyas were eager to have FSD's representatives try the product samples with no restrictions whatsoever.

18.    Durkacz and Cugliari sampled the product and were intrigued by the potential for a possible business collaboration with Gulyas and GBB, and therefore continued their dialogue with GBB's representatives over the next few days and weeks.

19.    At all times, Romano remained involved in these discussions and he strongly encouraged FSD to pursue a potential transaction with GBB.

20.    In furtherance of exploring a potential transaction, the parties, including Romano individually, agreed to a Mutual Non-Disclosure Agreement (the "NDA") that they all signed on July 5, 2022, which would permit the parties to conduct due diligence and share otherwise

confidential information.

21.     Prior to the execution of the NDA, no confidential information between the parties had been exchanged, discussed or identified. Indeed, the whole purpose of executing the NDA was to give the parties comfort to thereafter exchange any such information.

22.     The NDA defines "Confidential Information" as:

> any information previously or hereafter disclosed by or on behalf of the Disclosing Party to the Recipient, either directly or indirectly, in writing, orally or by inspection of tangible objects, including, without limitation, business plans, customer data, customer lists, customer names, designs, documents, drawings, engineering information, financial analysis, hardware configuration information, inventions, market information, marketing plans, processes, products, product plans, research, services, specifications, software, source code, trade secrets or any other information that the Disclosing Party identifies as "confidential," "proprietary" or some similar designation or that reasonably appears to be confidential or proprietary because of legends or other markings, the circumstances of disclosure, or the nature of the information itself.

23.     The NDA expressly excludes from the definition of "Confidential Information" "any information which (i) is now, or hereafter becomes . . . generally known and made generally available in the public domain" ("Confidential Information").

24.     The NDA also states that "[e]ach party understands and agrees that nothing herein requires either party . . . to proceed with the Opportunity or any relationship in connection with which Confidential Information may be disclosed."

25.     Following execution of the NDA, the parties spent several months pursuing a potential business transaction. During that time, GBB – often through Romano – forwarded information to FSD's representatives that it now claims was confidential and proprietary.

26.     As early as August 2022 (just one month after the NDA was executed), FSD's representatives asked GBB to provide information relating to its beverage formulation(s) so that

they could review and test the product, and other due diligence and research could be conducted. While GBB provided a list of some of its alleged product ingredients, no formulations, amounts of ingredients, or any methods of manufacturing, mixing, etc. were ever disclosed to FSD, despite its repeated requests.

27.     Nonetheless, the parties continued to discuss FSD's potential acquisition of GBB's assets, and Romano continued to encourage that FSD acquire GBB.

28.     FSD and GBB both secured outside counsel who began to negotiate a detailed Asset Purchase Agreement ("APA"), whereby FSD would acquire the operating assets of GBB.

29.     Romano remained closely involved in all aspects of FSD's relationship with GBB and the parties' negotiations. Romano was in regular contact with FSD's key decision-makers and discussed with FSD's executives and board members the due diligence efforts being undertaken by FSD. Romano would also provide both business and legal advice to FSD with regard the scope and terms of the proposed transaction being negotiated with GBB.

30.     On or about November 8, 2022, as part of customary due diligence, GBB arranged a site visit for FSD's representatives to view the manufacturing facility used by GBB. The purpose of this visit was for FSD to do a general inspection of the facility to provide FSD confidence that the facility was up to the proper standards and applicable regulations and had the manufacturing capabilities and capacity to launch a commercial product.

31.     Durkacz and Lucid's Dr. Lakshmi Kotra attended the site visit where they met with several of GBB's representatives and toured the facility. At that time of the site inspection, no GBB products were being manufactured there.

32.     During this time, outside counsel for FSD and GBB continued to exchange multiple drafts of the APA, all of which were subject to GBB still providing its formulations and other

details that FSD had been requesting for months.

33.     Finally, on Sunday, November 13, 2022, an "execution copy" of the APA was circulated, reflecting terms fully negotiated and agreed to by both FSD and GBB over the past months. Arrangements were made for the APA to be signed during an in-person meeting in Toronto.

34.     Notwithstanding their agreement, on Tuesday, November 15, 2022, the day after the in-person meeting to sign the APA in Toronto was to take place, a new lawyer purporting to represent GBB reached out to FSD's counsel informing that he had just been engaged by GBB regarding the transaction.

35.     Despite the parties agreeing to the previously circulated execution-ready copy of the APA, the new lawyer delivered a marked-up version of the APA days later with materially different terms that, among other things, would entitle GBB to millions of dollars in cash and stock from FSD, even if the transaction never closed.

36.     FSD was outraged by GBB's eleventh hour bait and switch.

37.     FSD had already grown concerned about some of GBB's ingredients in its product and also its refusal to provide its detailed formulations. The fact that GBB was also now trying to materially alter the deal was too much for FSD to continue, as they no longer trusted GBB.

38.     As a result, on December 12, 2022, FSD advised GBB in writing that it was terminating any further discussion regarding its potential acquisition of GBB's assets.

39.     By this time, Romano had become a Director at FSD.

40.     As a result of FSD's refusal to purchase GBB's assets as well as the manner in which Romano conducted himself as a Director, a rift developed between Romano and other executives at FSD.

41.    Less than two weeks later, on May 1, 2023, GBB filed its lawsuit against FSD and its affiliate, FSD Biosciences, claiming that they breached the NDA and misappropriated GBB's trade secrets. (ECF No. 1).

42.    On May 30, 2023, FSD and FSD Biosciences filed a motion to dismiss the Complaint pointing out the paradox in GBB's claims that the information then alleged to be confidential and trade secrets was actually disclosed in public-facing patents GBB claimed to own. (ECF No. 12).

43.    Faced with this legal bar to its claims, rather than oppose the motion to dismiss, GBB filed an Amended Complaint on June 9, 2023, this time claiming, *inter alia*, that the allegedly misappropriated confidential information and trade secrets did not include the information disclosed in the patents, but were instead comprised of a never-before-mentioned "revised ingredient list" allegedly given to FSD and formulations and methods of manufacturing and combining ingredients allegedly shared with FSD's representatives during their site visit to the GBB's manufacturing facility in November 2022. (ECF No. 19).

44.    To support this completely new theory of liability, the Amended Complaint relied upon purported information that Durkacz allegedly told to an unnamed "third party" source in late April 2023.

45.    Specifically, the Amended Complaint alleged that FSD was working on a "parallel program" that was "almost identical" to GBB's, using sixteen of the nineteen ingredients in GBB's drink, and that Durkacz admitted to this unnamed "third party" source that he never would have agreed to FSD's product development plans unless he thought FSD was developing something totally different from GBB. (ECF No. 19 ¶¶ 44-47).

46.    In discovery, GBB has admitted that "[t]he source of the information [in paragraphs

22

44-47 of the FAC] was Joseph Romano, which serves as the basis for the allegations and assertions." GBB Responses and Objections to FSD's Interrogatories at Interrogatory No. 6.

47.     In "late April 2023" when GBB alleges Durkacz spoke to its "third party" source – which GBB now admits was Romano – Romano was a Director of FSD and owed fiduciary duties to FSD, including a duty of loyalty, a duty of care, a duty to act in good faith, a duty to avoid conflicts of interest, a duty to maintain confidentiality, and a duty to act in the best interests of FSD.

48.     Romano had also long acted as counsel to FSD, providing legal advice to FSD on, among other things, its product development efforts and its dealings with GBB.

49.     Romano, serving as a Director and corporate counsel for FSD at the time, either deliberately disclosed confidential and proprietary information to GBB or fabricated such information, which was subsequently included in GBB's Amended Complaint.

50.     This collaboration between Romano and GBB demonstrates a clear conflict of interest, contravening Romano's obligations to maintain FSD's confidential information and act in FSD's best interests.

51.     Romano's efforts to assist GBB in this litigation – by providing GBB with information he claims was privately discussed by FSD executives – whether true or not – contravenes the duties he owed to FSD.

52.     As of June 29, 2023, Romano is no longer a Director of FSD.

### COUNT I – BREACH OF FIDUCIARY DUTY
### (AGAINST THIRD-PARTY DEFENDANT JOSEPH ROMANO)

53.     FSD repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

54.     In his capacity as a duly elected Director of FSD Pharma, Romano stood in a

fiduciary relationship with FSD, owing it a duty of loyalty, a duty of care, a duty to act in good faith, a duty to avoid conflicts of interest, a duty to maintain confidentiality, and a duty to act in the best interests of FSD.

55.     Romano's position of responsibility to FSD placed him in a position of trust through which he was given access to FSD's proprietary and confidential business and product development plans and other confidential information.

56.     Romano willfully and intentionally disclosed confidential and proprietary knowledge and information, which he learned in his capacity as a Director and counsel to FSD, and intentionally shared or fabricated that information with GBB in an effort to harm FSD's interests in breach of the duties he owed FSD.

57.     Romano's actions—which were made maliciously with the intent to harm FSD, and/or with conscious disregard and reckless indifference to the harm that he knew it would cause to FSD—constitute a breach of his fiduciary duties to FSD.

58.     As a direct and proximate cause of Romano's deliberate breach of his fiduciary duty to FSD, FSD has suffered, and will continue to suffer, irreparable harm and damages including, but not limited to, damage to FSD's reputation, harm to FSD as it attempts to enter the market with a product that will compete with GBB, and the costs incurred by FSD to litigate this case based on alleged facts provided to GBB from Romano.

**WHEREFORE**, FSD request that the Court enter judgment in its favor and against Third-Party Defendant Joseph Romano for the following relief:

a.      Damages in an amount to be determined at trial;

b.      Punitive damages;

c.      Prejudgment and post-judgment interest;

d.      All costs incurred in this action;

      e.      Attorneys' fees as permitted by law; and

      f.      All such other, additional and further relief as this Court deems appropriate and just.

## COUNT II –AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

## (AGAINST COUNTERCLAIM DEFENDANT GBB)

59.     FSD repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

60.     At all relevant times, Romano was a Director of FSD and/or provided legal advice to FSD.

61.     As a Director of FSD, Romano owed FSD fiduciary duties, including but not limited to, fiduciary duties of loyalty, care, and to act in the best interests of FSD.

62.     At all relevant times, GBB knew that Romano was a Director of FSD Pharma and that he owed fiduciary duties to FSD.

63.     As set forth in detail above, Romano repeatedly breached his fiduciary duties owed to FSD by collaborating with GBB to assert the allegations in the Amended Complaint.

64.     GBB knowingly aided and abetted Romano in the breach of his fiduciary duties by drafting the Amended Complaint.

65.     As a direct and proximate cause of GBB's actions—which were made maliciously with the intent to harm FSD, and/or with conscious disregard and reckless indifference to the harm that it knew it would cause to FSD—FSD has suffered, and will continue to suffer, irreparable harm and damages as a result of GBB's conduct, including but not limited to, damage to FSD's reputation, harm to FSD as it attempts to enter the market with a product that will compete with GBB, and the costs incurred by FSD to litigate this case based  on alleged facts provided to GBB from Romano.

**WHEREFORE**, FSD request that the Court enter judgment in its favor and against Counterclaim Defendant GBB for the following relief:

a. Damages in an amount to be determined at trial;

b. Punitive damages;

c. Prejudgment and post-judgment interest;

d. All costs incurred in this action;

e. Attorneys' fees as permitted by law; and.

f. All such other, additional and further relief as this Court deems appropriate and just.

Dated:  January 22, 2024                              Respectfully submitted,

**BLANK ROME LLP**

By: */s/ Nicole R. Topper*
Nicole R. Topper
Florida Bar No. 558591
Blank Rome LLP
500 E. Broward Blvd., Suite 2100
Ft. Lauderdale, FL 33394
Phone: (954) 512-1805
Facsimile: (954) 512-1775
Email: Nicole.Topper@BlankRome.com

Jason Snyderman (*pro hac vice*)
Danielle Hudson (*pro hac vice*)
Robert C. Levicoff (*pro hac vice*)
Blank Rome LLP
130 North 18th Street
Philadelphia, PA 19103
Email: Jason.Snyderman@BlankRome.com
Email: Danielle.Hudson@BlankRome.com
Email: Robert.Levicoff@BlankRome.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

GBB DRINK LAB, INC.,

      Plaintiff,

      v.

FSD PHARMA INC. and FSD
BIOSCIENCES INC.,

      Defendants.

**CASE NO: 23-CV-60800-AHS**

---

**CERTIFICATE OF SERVICE**

      I, Nicole R. Topper, Esq., hereby certify that I have caused the following document to be served via e-mail on January 22, 2024, on the counsel identified below:

    1)    FSD Pharma, Inc.'s and FSD Biosciences, Inc.'s Answer to the Amended Complaint

This document has been served this day upon:

Darren A. Heitner, Esq.
Heitner Legal, P.L.L.C.
215 Hendricks Isle
Fort Lauderdale, FL 33301
Email: Darren@heitnerlegal.com
*Counsel for Plaintiff GBB Drink Lab, Inc.*

                         By:     */s/ Nicole R. Topper*
                                   Nicole R. Topper
                                   Florida Bar No. 558591
                                   Blank Rome LLP
                                   500 E. Broward Blvd., Suite 2100
                                   Ft. Lauderdale, FL 33394
                                   Phone: (954) 512-1805
                                   Facsimile: (954) 512-1775
                                   Email: Nicole.Topper@BlankRome.com

                                   Jason Snyderman (*pro hac vice*)
                                   Danielle Hudson (*pro hac vice*)
                                   Robert C. Levicoff (*pro hac vice*)
                                   Blank Rome LLP

130 North 18th Street
Philadelphia, PA 19103
Email: Jason.Snyderman@BlankRome.com
Email: Danielle.Hudson@BlankRome.com
Email: Robert.Levicoff@BlankRome.com

162435.00604/134298436v.1